

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00159-CV

_____

IN THE MATTER OF T.H.

---

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-122960-24

---

Before Kerr, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

T.H. (Timothy)[1] appeals from the juvenile court's order waiving its jurisdiction and transferring the case to a criminal district court for him to be tried as an adult for murder and aggravated assault with a deadly weapon. In a single issue, Timothy argues that the juvenile court abused its discretion by certifying him to stand trial as an adult because the evidence is legally insufficient to support the transfer order. We will affirm.

## I. Background

In December 2023, Timothy was 16 years old and lived with his cousin D.D. (Daniel) and Daniel's girlfriend on Stalcup Road in Fort Worth. Timothy and Daniel sold and distributed drugs and firearms and had also discussed turning part of the home into a "grow house" so they could grow their own marijuana to sell and distribute.

Timothy's brother B.B. (Brian) was also staying at the home at the time. Brian helped transport, deliver, and sell drugs. Timothy, Daniel, Brian, and Timothy's father T.H. Sr. (Father) worked together in the drug business. Timothy supplied some of Father's narcotics—both to sell and for Father's own use. Father also used Timothy as a go-between between himself and Daniel.

---

[1]Throughout this opinion, we use aliases to refer to minors and to Timothy's parents or other family members. *See* Tex. R. App. P. 9.8(c)(2).

On December 22, 2023, Timothy texted Daniel that he had "a play" on an AK-style pistol. Timothy sent Daniel a photograph of the pistol, and Daniel responded, "[O]h, that's nice, are you gonna get it[?]" Timothy replied, "[Y]eah, but I'm not gonna pay for it." Daniel then asked, "[A]re you gonna slime[2] him?" Timothy responded, "[Y]eah," and explained that the gun's seller was "green" and "an easy target."

Timothy's easy target was Roy Jackson. Timothy and Jackson knew each other from school. Communicating electronically, Timothy told Jackson to meet him at the intersection of Willie Street and Dillard Street in Fort Worth on the evening of December 27, 2023. Jackson drove there and contacted Timothy to let him know that he had arrived. Timothy responded that he was at a nearby store, but when Jackson offered to meet him there, Timothy told him to wait and that he was walking toward the intersection. Sensing a setup, Jackson left.

The next day, December 28, 2023, Timothy sent Jackson the address and a photograph of a new meeting spot at 5601 Rickenbacker Place in Fort Worth. On his way there that afternoon, Jackson picked up his friend Kambron Pryor-Somerville and Somerville's girlfriend, Mercedes Gatewood. But when Jackson arrived at 5601 Rickenbacker, he noticed that the surroundings did not look like those in the photograph Timothy had sent to him. Unnerved, Jackson circled the block. He then

---

[2]"Slime" means rob.

contacted Timothy via cellphone; Timothy told Jackson to park behind a box truck parked on Rickenbacker. Jackson informed Timothy that he was driving a white Kia and then parked behind the box truck, notified Timothy that he was there, and waited.

A few minutes later, shots were fired at Jackson's car. As Jackson drove away, he saw Timothy with an AR-style pistol. Realizing that Somerville had been shot, Jackson decided to drive to the hospital. He called 911 and reported that his friend had been shot and that they were on their way to the hospital. Patrol officers located Jackson's vehicle and followed it into the hospital's ambulance bay. Jackson told the officers that he had gone to meet Timothy and that Timothy had shot at him.

Jackson sustained a gunshot wound to the back of his shoulder, and Gatewood, who had been sitting in the backseat, had a graze bullet wound on her leg. Somerville, the front-seat passenger, sustained a fatal gunshot wound to the back of his neck. After Somerville was pronounced dead, Norman Abrams, a homicide detective with the Fort Worth Police Department, was called to the hospital.

When Detective Abrams arrived at the hospital, he saw that Jackson's car had been shot in multiple places and that "[t]here was blood, broken windows, [and] apparent gunshot impacts on both the glass and the metal frame . . . of the vehicle." Detective Abrams interviewed Gatewood and Jackson. Both recounted to Detective Abrams what had happened, and Jackson identified Timothy as the shooter. Detective Abrams later searched the backyard at 5601 Rickenbacker and found nineteen 5.56 mm shell casings with unusual markings.

During his investigation, Detective Abrams obtained information from Jackson's cellphone and from Gatewood that corroborated Jackson's timeline. Detective Abrams went to the location of Timothy and Jackson's first planned meeting—Willie and Dillard Streets—and determined that the location was better suited to a robbery than a sale because it was poorly lit and some of the surrounding lots were heavily treed, which provided places to hide. Detective Abrams also determined that Jackson had asked to meet at a public place on December 28, 2023. Timothy had originally agreed but then changed the meeting location to 5601 Rickenbacker.

Timothy's cellphone records showed that his phone was within a 600-yard radius of the area at the time of the shooting. Using Timothy's cellphone number, Detective Abrams was able to tie Timothy's various social-media, Google, Gmail, and iCloud accounts together. A search of these accounts revealed photographs of an AR15-style pistol and photographs of Timothy with the weapon, which he had advertised for sale. There were also photographs of Timothy with a 7.62-style pistol.

The day after the shooting, Timothy disabled the "find my iPhone feature" on his cellphone. On December 31, 2023, Timothy sent a text to someone saying, "Stop textin[g]." The other party responded, "?," and Timothy replied, "Jus[t] stop; New # Later." In text exchanges with his girlfriend on December 31, 2023, and January 1,

2024, Timothy told her "don't b saying ts[3] to errbody," and "I should get a new # tmr." Later on January 1, 2024, Timothy's cellphone number was terminated. And on January 13, 2024, Timothy changed his Instagram handle from "murdahman6" to "mtvshow23." Jackson reported to Detective Abrams that after the shootings, he had been contacted from accounts bearing those handles with "threatening messages and emojis [directed] to him and his family."

A search of Timothy's accounts also revealed that in the days immediately following the shooting, Timothy had searched the Internet for "shootings in fort worth," "December 28 shootings," "used iphones for sale," and "iphones for sale." By January 16, 2024, Timothy had secured a new iPhone. The following day, he searched the Internet for information about Somerville and about how to recover Instagram, Apple, and Google accounts.

Detective Abrams's investigation soon led him to the Stalcup home, which was within walking distance of the shooting scene. Detective Abrams searched the home pursuant to a search warrant and found narcotics, cocaine, Promethazine, and a bag of green-tip, 5.56 mm rounds of ammunition.[4] The bottom stamps of those ammunition rounds matched those found at the shooting scene.

---

[3]According to Detective Abrams "ts" meant "that shit."

[4]Detective Abrams described green-tip ammunition as follows: "Green[-]tip ammo . . . [is] a full metal jacketed round with a solid core. The green tips were used to annotate their use for increase[d] penetration, not necessarily armor piercing, but increase[d] penetration into body armor and into certain metals as opposed to the

At some point, Daniel was arrested and jailed, and Daniel's girlfriend and Timothy continued to sell and distribute drugs from the Stalcup home. Timothy also continued attempting to purchase weapons and narcotics even after he knew that a warrant had been issued for his arrest for murder and aggravated assault. He also bragged to his girlfriend that he was going to beat the charges.

Timothy was arrested, and the State filed a petition requesting his discretionary transfer from juvenile court to criminal district court. The State initially alleged that probable cause existed to show that Timothy had committed two counts of murder, three counts of aggravated assault with a deadly weapon, and one count of deadly conduct. The State amended its petition to allege one count of murder (Paragraph One) and two counts of aggravated assault with a deadly weapon (Paragraphs Two and Three).

On April 10, 2024, the juvenile court held the transfer hearing.[5] Detective Abrams testified regarding his investigation, the results of which we set out above. Keanetta Brown, a court-intake officer with the Tarrant County Juvenile Probation Department who was assigned to Timothy, and her supervisor, David Ansley, also testified.

---

non-green tip." Rap lyrics recovered from Timothy's iCloud account—the admission of which Timothy does not challenge—referenced using green-tip ammunition.

[5]By this time, Timothy was 17 years old.

Brown testified that Timothy—who had been detained in the Tarrant County Juvenile Detention Center since the case's inception—admitted to her that he had used THC daily. He also tested positive for the substance when he was first detained. Brown further testified that while detained, Timothy had been involved in two physical altercations, one involving a staff member when Timothy was attacked by a fellow detainee and another involving that detainee. But Timothy had also displayed good behavior while detained.

Although Timothy did not have a juvenile record, the resource staffing committee had recommended that Timothy be committed to the Texas Juvenile Justice Department (TJJD). According to Brown, the juvenile-justice system's goal is rehabilitation, and it was her opinion that if Timothy were found delinquent, it was in his best interest to be rehabilitated. Ansley testified about the resources available at TJJD to rehabilitate Timothy.

Brown further opined that Timothy appeared to be a "typical teenager," neither mature nor immature for his age. He also seemed to be relying on his parents' advice in making legal decisions in the case.

At the hearing's conclusion, the juvenile court stated that it was waiving jurisdiction and was referring the "matter to an adult felony district court for further prosecution." The juvenile court then signed an order waiving its jurisdiction and transferring the case to the appropriate criminal court for Timothy to be tried as an adult. In its order, the juvenile court found that Timothy was then 17 years old, that

he was at least 14 years old and less than 17 years old "at the time the [charged] act[s] . . . are alleged to have occurred," and that "no adjudication hearing ha[d] been conducted concerning said offenses." The juvenile court made the following additional findings:

> The Court finds the offense alleged in Paragraph One of the Petition Requesting [t]he Juvenile Court to Consider Discretionary Transfer to Criminal Court (Waiver of Juvenile Court Jurisdiction) on file in this cause is a first[-]degree felony offense under the penal laws of the State of Texas if committed by an adult. The Court finds the offense[s] alleged in Paragraphs Two and Three of the Petition Requesting [t]he Juvenile Court to Consider Discretionary Transfer to Criminal Court (Waiver of Juvenile Court Jurisdiction) on file in this cause are second[-]degree felony offenses under the penal laws of the State of Texas if committed by an adult. The Court further finds that the offenses are against the person of another.

> The Court finds that there is probable cause to believe that the Respondent committed the offenses alleged in Paragraph[s] One, Two, and Three of the Petition Requesting [t]he Juvenile Court to Consider Discretionary Transfer to Criminal Court (Waiver of Juvenile Court Jurisdiction) on file in this cause number.

> The Court finds that the Respondent is of sufficient sophistication and maturity to be tried as an adult.

> The Court finds that this Court should waive its exclusive original jurisdiction and transfer this Cause to an appropriate District Court (with criminal jurisdiction) or Criminal District Court of Tarrant County, Texas.

> The Court, after considering all the testimony, social evaluation, full investigation of the Respondent, his circumstances, and the circumstances of the alleged offenses, and other admitted records and reports finds that it is contrary to the best interests of the public to retain jurisdiction.

9

The Court finds that because of the seriousness of the offenses alleged and the background of the Respondent, the welfare of the community requires criminal proceedings.

In making the above determinations, the Court has considered, among other matters:

(1)   whether the alleged offenses are against person or property, with the greater weight in favor of transfer given to offenses against the person;

(2)   the sophistication and maturity of the child;

(3)   the record and previous history of the child; and

(4)   the prospects of adequate protection of the public and the likelihood of reasonable rehabilitation of the child by use or procedures, services, and facilities currently available to the Juvenile Court.

Timothy timely filed a notice of appeal. In a single issue, he challenges the sufficiency of the evidence supporting the required statutory factors underpinning the juvenile court's finding "that because of the seriousness of the offenses alleged and the background of the Respondent, the welfare of the community requires criminal proceedings."

## II. Applicable Law and Standards of Review

Under the Texas Family Code, a juvenile court may waive its exclusive original jurisdiction and transfer a juvenile to a criminal district court for criminal proceedings if

(1) the child is alleged to have violated a penal law of the grade of felony;

(2) the child was:

10

(A) 14 years of age or older at the time he is alleged to have committed the offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree, and no adjudication hearing has been conducted concerning that offense; or

(B) 15 years of age or older at the time the child is alleged to have committed the offense, if the offense is a felony of the second or third degree or a state jail felony, and no adjudication hearing has been conducted concerning that offense; and

(3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

Tex. Fam. Code Ann. § 54.02(a); *see id.* § 51.02(2)(A) (defining "child" as "a person who is . . . ten years of age or older and under 17 years of age").

The State has the burden to persuade the juvenile court by a preponderance of the evidence that the community's welfare requires the transfer, either because of the seriousness of the offense or the child's background, or both.[6] *In re A.K.*, No. 02-20-00410-CV, 2021 WL 1803774, at *19 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.); *see* Tex. Fam. Code Ann. § 54.02(a)(3). In making this determination, the juvenile court must "consider, among other matters," the following four factors: (1) whether the alleged offense was against a person or property, with greater weight in favor of transfer given to offenses against the person; (2) the child's

---

[6]Timothy does not challenge the juvenile court's determination that there is probable cause to believe that he "committed the offense[s] alleged." Tex. Fam. Code Ann. § 54.02(a)(3).

sophistication and maturity; (3) the child's record and previous history; and (4) the prospects of adequate protection of the public and the likelihood of the child's rehabilitation through procedures, services, and facilities currently available to the juvenile court.[7] Tex. Fam. Code Ann. § 54.02(f). Any combination of these factors may suffice to support a waiver of jurisdiction; not every factor needs to weigh in favor of transfer. *See In re Z.M.*, No. 02-21-00213-CV, 2021 WL 4898851, at *1 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op.) (citing *A.K.*, 2021 WL 1803774, at *19). The juvenile court need not consider any other factors, nor does it need to find that the evidence establishes each factor. *Id.* (citing *A.K.*, 2021 WL 1803774, at *19).

When reviewing a juvenile court's waiver-and-transfer order, we first review the court's specific fact-findings regarding the Section 54.02(f) factors under a traditional evidentiary-sufficiency review.[8] *E.g.*, *A.K.*, 2021 WL 1803774, at *18 (citing *In re*

---

[7]Although Timothy states throughout his brief that there are "six enumerated factors" in Section 54.02(f), there are only four factors. *See id.* § 54.02(f). Timothy appears to be relying on a pre-1995 version of the statute. *See* Act of May 27, 1995, 74th Leg., R.S., ch. 262, § 34, sec. 54.02, 1995 Tex. Gen. Laws 2517, 2533 (current version at Tex. Fam. Code Ann. § 54.02(f)) (amending Section 54.02(f) to delete two of the former six factors).

[8]We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if,

*C.M.M.*, 503 S.W.3d 692, 701 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)).

We then review the juvenile court's ultimate waiver decision for an abuse of

discretion:

> That is, in deciding whether the juvenile court erred to conclude that the
> seriousness of the offense alleged or the background of the juvenile or
> both called for criminal proceedings for the welfare of the community,
> we simply ask, in light of our own analysis of the sufficiency of the
> evidence to support the Section 54.02(f) factors and any other relevant
> evidence, whether the juvenile court acted without reference to guiding
> rules or principles.

*Id.* (citing *C.M.M.*, 503 S.W.3d at 701). A juvenile court abuses its discretion when its

transfer decision is essentially arbitrary, given the evidence upon which it was based.

*Id.* (citing *C.M.M.*, 503 S.W.3d at 701). In contrast, "a waiver decision representing 'a

reasonably principled application of the legislative criteria' generally will pass muster

under this standard of review." *Id.* (quoting *C.M.M.*, 503 S.W.3d at 701).

### III. Analysis

Timothy makes two arguments in his sufficiency challenge. First, he complains

that the juvenile court's order lacks case-specific fact-findings and asks us to review

"the method of analysis and review of orders transferring jurisdiction in . . . juvenile

case[s]" and to determine whether a "juvenile court must 'show its work'" by

---

after considering and weighing all the pertinent record evidence, we determine that
the credible evidence supporting the finding is so weak, or so contrary to the
overwhelming weight of all the evidence, that the finding should be set aside and a
new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on
reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821,
823 (Tex. 1965).

including case-specific fact-findings that had been required by *Moon v. State*, 451 S.W.3d 28 (Tex. Crim. App. 2014). Second, he argues that considering the statutory factors set out in Section 54.02(f), the evidence is legally insufficient to support the juvenile court's finding that the welfare of the community requires criminal proceedings because of the seriousness of the offense alleged or the background of the child. *See* Tex. Fam. Code Ann. § 54.02(a)(3), (f). We address each of these arguments in turn.

In *Moon*, the Texas Court of Criminal Appeals held that a juvenile court must "show its work" in an order waiving juvenile jurisdiction under Section 54.02 by including case-specific fact-findings supporting the court's decision to waive its jurisdiction. 451 S.W.3d at 49 (stating that "Section 54.02(h) obviously contemplates that both the juvenile court's reasons for waiving its jurisdiction and the findings of fact that undergird those reasons should appear in the transfer order"); *see also* Tex. Fam. Code Ann. § 54.02(h) ("If the juvenile court waives jurisdiction, it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court, and shall transfer the person to the appropriate court for criminal proceedings . . . ."). The court of criminal appeals further held that when reviewing the sufficiency of the evidence supporting the juvenile court's decision to waive its jurisdiction, an "appellate court must limit its sufficiency review to the facts that the juvenile court expressly relied upon, as required

to be explicitly set out in the juvenile transfer order under Section 54.02(h)." *Moon*, 451 S.W.3d at 50.

But the court of criminal appeals has overruled *Moon*. In *Ex parte Thomas*, the court held that no statutory provision "require[s] the juvenile court to recite the underlying facts upon which its reason for transfer is based." 623 S.W.3d 370, 379 (Tex. Crim. App. 2021). The court explained that contrary to *Moon*'s reasoning, "the statutory scheme merely directs the juvenile court to state the reasons for the waiver set out in the statute." *Id.* While acknowledging that Section 54.02(h) states that the juvenile court "shall state specifically in the order its reasons for waiver . . . including the written order and findings of the court," *id.* at 378 (quoting Tex. Fam. Code Ann. § 54.02(h)), the court concluded that the "including the written order and findings of the court" additional language in Section 54.02(h) "allows for 'findings,' but it does not require case-specific fact-finding beyond a statement of the reasons for transfer, *id.* at 379. And although an order waiving a juvenile court's jurisdiction must state the court's reasons for doing so, a juvenile court is not required to include in the order detailed, case-specific findings supporting its decision. *See id.* at 381–83.

In short, the court of criminal appeals' holding was clear: "A juvenile transfer order entered after the required transfer hearing and complying with the statutory requirements constitutes a valid waiver of jurisdiction even if the transfer order does not contain factually-supported, case-specific findings." *Id.* at 383. In reaching its

holding, the court rhetorically asked, "So What is Left of *Moon*?" and answered, "Nothing." *Id.* at 381. The court also noted the legislature's response to *Moon*:

> What the Legislature did do, in response to our decision in *Moon*, was repeal Article 44.47 of the Code of Criminal Procedure and add Section 56.01(c)(1)(A) to the Family Code. That took review of these claims away from this Court and created a vehicle for immediate, interlocutory appeal to the courts of appeals and then to the Texas Supreme Court. This provides more immediate safeguards for juveniles being transferred to district court for trial as an adult than the fact-specific finding requirement set out in *Moon*. The Texas Supreme Court has not addressed the method of analysis and review of orders transferring jurisdiction in juvenile cases, but it is not bound by *Moon*. And decades of case law preceding *Moon* from this Court and our sister court alike remain as guidance for the appellate courts.

*Id.* at 382–83 (footnotes omitted). Although the "Texas Supreme Court has not addressed the method of analysis and review of orders transferring jurisdiction in juvenile cases," *id.* at 383, we—as an intermediate appellate court—are bound by the court of criminal appeals' interpretation of Section 54.02. *See Wiley v. State*, 112 S.W.3d 173, 175 (Tex. App.—Fort Worth 2003, pet. ref'd); *see also Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex. 1964) ("After a principle, rule or proposition of law has been squarely decided by the Supreme Court, or the highest court of the State having jurisdiction of the particular case, the decision is accepted as a binding precedent by the same court or other courts of lower rank when the very point is again presented in a subsequent suit between different parties."). And we have recognized *Thomas*'s holding in at least one of our prior opinions: "A juvenile transfer order entered after the required transfer hearing and complying with the statutory requirements

constitutes a valid waiver of jurisdiction even if the transfer order does not contain factually-supported, case-specific findings." *A.K.*, 2021 WL 1803774, at *19 (quoting *Thomas*, 623 S.W.3d at 383). We thus conclude that the juvenile court was not required to include case-specific findings in its transfer order and now turn to Timothy's sufficiency challenge.

We have recognized that "[t]he nature and seriousness of the specific alleged offense, alone, may justify the juvenile court's waiver of jurisdiction 'notwithstanding other section 54.02(f) factors, so long as the offense: (1) is substantiated by evidence at the transfer hearing, and (2) is of sufficiently egregious character.'" *Z.M.*, 2021 WL 4898851, at *5 (quoting *In re M.A.T.*, No. 13-18-00295-CV, 2018 WL 5289550, at *7 (Tex. App.—Corpus Christi–Edinburg Oct. 25, 2018, no pet.) (mem. op.)). Here, the alleged offenses—murder and aggravated assault—were each against a person, which weighs more greatly in favor of transfer than if the offense were against property. *See* Tex. Fam. Code Ann. § 54.02(f)(1). And these offenses were serious: the shooting was premeditated and resulted in Somerville's death and injuries to Jackson and Gatewood; the shooting was in furtherance of Timothy's obtaining a weapon from Jackson that Timothy wanted as part of his firearm-selling business; and at least 19 rounds were fired during the shooting.

Turning to the evidence regarding Timothy's sophistication and maturity, *see id.* § 54.02(f)(2), the juvenile court expressly found that Timothy was of "sufficient sophistication and maturity to be tried as an adult." At the time of the shooting,

17

Timothy was four months shy of his seventeenth birthday. The fact that the shooting was premeditated rather than impulsive showed Timothy's sophistication and maturity, as did his planning the meetings with Jackson in locations conducive to committing a robbery. So did Timothy's working with Daniel, Brian, and Father in the drug business; Timothy and Daniel's drugs and weapons business; and Timothy's maintaining that business after Daniel was arrested. Timothy further demonstrated his sophistication and maturity by taking steps to evade culpability after the shooting by changing his cellphone number, getting a new cellphone, changing his Instagram handle, and using Instagram to track down and threaten Jackson.

Despite this evidence, Timothy points to Brown's testimony that he appeared to be a "typical teenager," was neither mature nor immature for his age, and seemed to be relying on his parents' advice in making decisions in the case as evidence of his lack of sophistication and maturity. But according to the psychological evaluation conducted as part of the diagnostic study, social evaluation, and investigation ordered and considered by the juvenile court, Timothy's "level of maturity [was] uneven, ranging from meeting to exceeding that of same-aged peers,"[9] and his "level of sophistication appear[ed] to slightly exceed that of same-aged peers." The psychological evaluation also revealed that Timothy did not have an intellectual disability or significant mental illness and that he appeared "capable of understanding

_____

[9]The psychologist observed that Timothy "came across as if he may not [have] appreciate[d] the gravity of his legal circumstances."

the legal implications surrounding a discretionary transfer motion and of assisting his attorney in his defense." We thus conclude (1) the juvenile court could have reasonably determined that Timothy could appreciate the nature and effect of his actions, that he understood right from wrong, and that the evidence of Timothy's level of sophistication and maturity weighed in favor of his being tried as an adult and (2) that these reasonable determinations sufficed to support the juvenile court's sophistication-and-maturity finding. *See id.*

Although Timothy had no prior juvenile history and there was testimony regarding the procedures, services, and facilities available in the juvenile system, Brown testified that the resource staff committee had determined that aside from confinement in TJJD, none of those resources would meet Timothy's needs. Both Brown and Ansley testified that if Timothy were adjudicated as a juvenile, they would recommend commitment to TJJD, but neither testified whether Timothy should be tried as an adult. From this testimony, the juvenile court could have reasonably concluded that given Timothy's involvement in the drugs-and-weapons business, the level of callousness and calculation Timothy displayed in planning and executing the crime, and the sophistication he showed in attempting to evade responsibility for it, the services available to Timothy through the juvenile-justice system would not have adequately protected the public and were unlikely to rehabilitate him. *See id.* § 54.02(f)(3) ("the record and previous history of the child"), (4) ("the prospects of

adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court").

The Section 54.02(f) factors "serve to facilitate the juvenile court's balancing of 'the potential danger to the public' posed by the juvenile offender with his 'amenability to treatment.'" *A.K.*, 2021 WL 1803774, at *19 (quoting *In re J.R.*, No. 05-20-00920-CV, 2021 WL 777090, at *6 (Tex. App.—Dallas Mar. 1, 2021, pet. denied) (mem. op.)). Here, the evidence regarding those factors sufficed to support the juvenile court's findings that because of the seriousness of the offenses and because of Timothy's background, the community's welfare required Timothy's transfer to criminal court. *See* Tex. Fam. Code Ann. § 54.02(a)(3). We thus conclude that the juvenile court did not abuse its discretion by certifying Timothy to stand trial as an adult. We overrule Timothy's sole issue.

## IV. Conclusion

Having overruled Timothy's single issue, we affirm the juvenile court's order waiving its jurisdiction and transferring the case to criminal district court.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: July 18, 2024